UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| CRESCENT TOWING & SALVAGE CO., INC. | CIVIL ACTION |
|---|---|
| VERSUS | NO. 08-1544 |
| M/V BELO HORIZONTE | SECTION "N" (4) |

CONSOLIDATED WITH

| WHITE CHESTNUT SHIPPING, S.A., ET AL | CIVIL ACTION |
|---|---|
| VERSUS | NO. 09-3497 |
| ST. JAMES STEVEDORING PARTNERS, LLC | SECTION "N" (4) |

## ORDER AND REASONS

Presently before the Court is the Motion for Summary Judgment filed by St. James Stevedoring Partners, LLC ("St. James") (Rec. Doc. 67).[1] The motion is opposed by Plaintiffs White Chestnut Shipping S.A. and Fleet Management Limited ("Plaintiffs"). For the reasons stated herein, **IT IS ORDERED** that the motion is **GRANTED** and that Plaintiffs' claims against St. James are **DISMISSED WITH PREJUDICE**.

---

[1] The motion concerns the claims asserted in Civil Action Number 09-3497. All claims in Civil Action 08-1544 have been dismissed. *See* Civil Action 08-1544, Rec. Doc. 122. Nevertheless, unless otherwise stated, all record references herein are to the record in Civil Action 08-1544.

## BACKGROUND

On or about April 5, 2008, Eugene Ledet worked on the lower Mississippi River as a deck hand for the M/V NED FERRY ("NED FERRY"). The NED FERRY is a harbor tug owned by Crescent Towing and Salvage Inc. ("Crescent Towing"). During the course of that work, Mr. Ledet sustained fatal injuries when a mooring line of the nearby M/V BELO HORIZONTE ("BELO"), a vessel owned and operated by Plaintiffs, parted and struck the wheelhouse of the NED FERRY.

At the time of Mr. Ledet's fatal injuries, the BELO was moored at a "mid-stream ship mooring buoy system" operated by St. James at Mile 158 of the Mississippi River near Convent, Louisiana. The parties' submissions explain that these buoy systems are designed to provide berths for cargo ships to moor for loading or unloading at a location other than a traditional wharf or dock along the river's bank. Each of St. James' three mid-stream buoy systems consists of three "up river" buoys and two "down river" buoys. The buoys are attached to the river bottom by a chain or cable. The up and down river buoys are spaced so as to allow the ship entering the berth to position itself between the two sets of buoys. The ship then drops its anchors and secures its bow and stern to the buoys with mooring lines from the ship. The mooring process may require the assistance of harbor tugs like the NED FERRY.

Once the cargo ship is moored, fleet tug boats then bring crane barges and cargo barges alongside the ship for cargo operations. It is the Court's understanding that, pursuant to a contract with St. James, Crescent Towing provides all tug services to ships berthed at the mid-stream buoy facility. Crescent Towing bills St. James for these services; St. James in turn bills the vessel.

The BELO is an ocean-going bulk cargo vessel of Hong Kong registry. In March 2008, Arcelor Mittal USA ("Arcelor") entered into a voyage charter with Plaintiffs to transport a large load of iron ore from Brazil to the St. James buoy facility for unloading. The BELO departed Brazil on March 18, 2008, and entered the Mississippi River the morning of April 3, 2008. The load of iron ore resulted in the BELO having a fresh water draft of 47 feet. Significantly, during this time, the river was experiencing its annual high water levels and the current was strong.

Captain Li Jain Zhong was the BELO's master during this voyage. While in the Mississippi River, however, the BELO also had the benefit of the compulsory pilot services provided by the New Orleans-Baton Rouge Steamship Pilots Association ("NOBRA"). Captain Timothy Rieder, the BELO's fourth compulsory pilot, was aboard and navigating the vessel as it made its way to its berth at St. James' buoy facility.

At approximately 6:50 p.m., Captain Rieder solicited the services of three Crescent Towing assist tugs, which included the NED FERRY, to help moor the BELO. The tugs worked at the direction of the Captains Rieder and Zhong. At 7:45 p.m., the BELO maneuvered into the St. James upper berth with the help of the assist tugs. It then began to drop its anchors and put out its mooring lines to the buoys. By 9:00 p.m., eleven mooring lines secured the BELO in place in its berth. At that time, the NOBRA pilot, Captain Rieder, discharged the assist tugs, returned all command of the BELO to Captain Zhong, and departed the ship.

Between 9:00 p.m. and midnight, a severe weather front brought strong winds and rain to the area. According to Captain Zhong, the BELO gradually began to yaw (swing) on its anchors and mooring lines. At approximately 2:00 a.m., one of the bow mooring lines parted. Once alerted of this event, Captain Zhong, who had been sleeping since about midnight, contacted the

3

BELO's Louisiana shipping agent, Celtic International Shipping Agency ("Celtic"), to request a NOBRA pilot and assist tugs for the BELO.[2]

Between 2:15 and 2:30 a.m., the NED FERRY arrived and took up position on the port bow quarter of the BELO to help steady it against the wind and current.[3] Additional bow mooring lines parted, however, at between 4:00 and 4:15 a.m. One of those lines recoiled and struck the wheelhouse of the M/V NED FERRY. Tragically, the impact was such that Eugene Ledet, who was in the wheel house with his captain, was hit and subsequently died of his injuries.

Between 4:30 and 4:50 a.m., four nearby tugs arrived to help push/hold the BELO.[4] At approximately 5:20 a.m., the NOBRA pilot arrived and, with the assistance of multiple tugs, re-positioned the BELO in a different berth of the St. James buoy system.[5] Thereafter, cargo operations commenced and were completed over the next seven days.[6] Two "hold in" tugs were utilized while the cargo was unloaded.[7]

In support of its motion for summary judgment, St. James maintains that it, as the buoy system operator, did not owe the legal duties with which Plaintiffs seek to charge it. On the showing made, the Court agrees.

---

[2] *See* Transcript of Deposition Testimony of Li Zian Zhong ("Zhong Depo."), Exhibit 10-B to St. James' Memorandum in Support of Motion for Summary Judgment (Rec. Doc. 67-12), pp. 72 and 75.

[3] *See* Exhibits 5 and 8 to St. James' Memorandum in Support of Motion for Summary Judgment (Rec. Docs. 67-6 and 67-9)

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

# LAW AND ANALYSIS

## I. Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986); *see also Lavespere v. Liberty Mut. Ins. Co.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S. Ct. 2553; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986); *Auguster v. Vermillion Parish School Bd.,* 249 F.3d 400, 402 (5th Cir. 2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir. 2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (emphasis in original) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed.2d 695 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S. Ct. 195 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little,* 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit

6

a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002).

**II.     Application**

Plaintiffs allege that St. James is legally responsible for the injury and death of Mr. Ledet, as well as the damage sustained by the NED FERRY and the BELO. Specifically, Plaintiffs contend that St. James negligently:

1. Directed and/or allowed the BELO to berth during dangerous flood stage river conditions;

2. Failed to provide assist tugs to hold her in place; and

3. Failed to properly advise the BELO's master and owners of the dangers presented by mooring the vessel in the buoy system at such a high river stage.[8]

In *Bunge Corporation v. M/V FURNESSBRIDGE*, 558 F.2d 790, 795-96 (5th Cir. 1977) (internal citations omitted), *cert. denied*, 435 U.S. 924, 98 S. Ct. 1488 (1978), the Fifth Circuit Court of Appeals addressed a wharfinger's duty regarding a berthing vessel. There, the Court explained:

> It is well settled that a wharfinger is not the guarantor of the safety of a ship coming to his wharf. He is, however, under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonably care and inspection, should be known to him and not reasonable known to the shipowner. *Trade Banner Line, Inc. v. Caribbean Steamship Co., S.A.*, 521 F.2d 229, 230 (5th Cir. 1975). The wharfinger's duty to warn applies only to "any hidden hazard or deficiency . . . not reasonably known to the shipowner." *Id.* Thus, no

---

[8]  *See* Verified Complaint (Civil Action 08-1544, Rec. Doc. 67-2 and Civil Action 09-3497, Rec. Doc. 1) at ¶7.

> warning is required "where the alleged obstruction or condition is open and obvious to those in charge of the vessel's management" or where those in control of the vessel have actual knowledge. *Construction Co. v. Isthmian Lines, Inc.*, 259 F. Supp. 336, 339 (D.Or. 1966). *See also Sabine Towing and Transportation Co. v. St. Joe Paper Co., 297* F. Supp. 748 (N.D. Fl. 1968).
>
> * * *
>
> If a mariner cannot fully perceive hazards even though the physical objects creating them are in plain sight, [however], then the duty to warn attaches.

*Bunge*, 558 F.2d at 795-76.

In *Bunge*, the Fifth Circuit additionally explained that, absent an assertion of control by the wharfinger, or, perhaps, a hidden defect in the docking facility, the master, not the dock owner, is responsible for the docking of the ship. *Id.* at 798-99. The Court further emphasized: "Use of tugs is an integral part of docking procedure and as such is a navigational operation for which the ship's master has exclusive responsibility." *Id.* at 799. *See also Delta Commodities, Inc. v. M/T JO OAK*, Civil Action No. 88-1349, 1989 WL 149253, *3-5 (E.D. La.1989)(Arceneaux, J.)(reiterating principles regarding wharfinger duties stated in *Bunge*).

Applying these legal principles here, the Court, on the showing made, finds no triable issues of fact to exist and concludes that St. James is entitled to judgment as a matter of law.[9] Significantly, Plaintiffs point to no evidence demonstrating that St. James – pursuant to contract or simply as a matter of fact – controlled the navigation of the BELO into its berth, or its continued

---

[9] Plaintiffs ask the Court to consider the distinction between stationary, visible objects, like wharves, and a mid-stream buoy system, that is noted in *Delta Transload, Inc. v. M/V NAVIOS COMMANDER,* 818 F.2d 445, 450 (5th Cir. 1987). Although the Court acknowledges this distinction, it does not, at least under the factual circumstances of this particular case, justify the imposition of the legal obligations urged by Plaintiffs.

maintenance of that position. A drafting mistake by counsel in preparing St. James' statement of uncontested material facts is not sufficient to carry this burden.[10]

The same is true with respect to the general statement, in St. James' intervention complaint, that it "either provided and/or facilitated other services for the M/V BELO HORIZONTE, including, but not limited to, ship dockage, launch boat services, line handling services and security, all of which were provided at the request of those involved in the management of the M/V BELO HORIZONTE."[11] There is no dispute that St. James operated the buoy facility and contracted with Crescent Towing to provide any tug services required by mooring ships and for cargo operations. These facts alone, however, do not render St. James responsible for the navigation and mooring of the BELO. Indeed, it undisputedly was the BELO's master, Captain Li Jain Zhong, who called for another NOBRA pilot and assist tugs after the first mooring line parted at approximately 2:00 a.m.

Plaintiffs' other arguments likewise are unavailing. First, the BELO at all relevant times was under the control of its own master, Captain Zhong, and/or a NOBRA pilot. Although Plaintiffs maintain (with no citations to evidence) that Captain Zhong "was new to this buoy system," there is no indication that: (1) Captain Zhong was not competent to serve as master of the

---

[10] *See* "Statement of Uncontested Material Facts for the Purposes of this Motion for Summary Judgment" (Rec. Doc. 67-13) at ¶7. Upon reviewing all of the parties' summary judgment submissions, the Court instructed St. James' counsel to address this particular statement as part of a reply memorandum. *See* Rec. Doc. 16. Having considered the submitted response (Rec. Doc. 188), the Court, for essentially the reasons stated therein, is satisfied that St. James does not actually contend, and has not admitted, that the BELO was "under the direction of St. James Stevedoring" as it anchored and set out its mooring lines in the mid-stream buoy facility. Indeed, as counsel has explained, St. James vehemently denies any control regarding the BELO's navigation and mooring process throughout the summary judgment memorandum that was submitted along with the statement of uncontested material facts.

[11] *See* Verified Complaint of Intervention (Rec. Doc. 14) at ¶4.

vessel; (2) was incapable of obtaining and understanding a weather forecast; (3) was not aware of the river's high water conditions and strong currents; and/or (4) would not realize that mooring a ship at a mid-stream buoy facility would bear some differences from docking at a stationary dock on the river's bank. To the contrary, Captain Zhong had just navigated the river with the assistance of *four* compulsory river pilots. He also specifically testified, moreover, that at least one of the pilots had advised him of the river's current conditions.[12]

In addition, electronic mail attached as Exhibit A to Plaintiffs' opposition memorandum reflects that Tim Ford of Celtic Marine, the BELO's Louisiana agent, had warned the BELO's voyage charterer, Arcelor Mittal, in response to inquiry made *prior* to the voyage, against having an arrival draft of 47 feet.[13] In offering this warning, Mr. Ford additionally emphasized: "Also, deep draft vessels often have trouble holding in position in mid-stream buoys so you run the risk of having to employ hold in tugs at USD600+ per hour each, until sufficient cargo is discharged and the vessel can hold on it[s] anchors/lines."[14] Presumably the BELO was privy to this information or, if not, could and should have sought information regarding the vessel's destination.

And, in any event, the vessel's crew was aware that, *prior* to the onslaught of bad weather, the NOBRA pilot, Captain Reider, had found it appropriate to utilize three assist tugs in maneuvering into the buoy system. Under these circumstances, it should have been apparent to the BELO's crew that extra stability measures might become appropriate if the water and weather

---

[12] *See* Zhong Depo. at p. 43.

[13] *See* Exhibit A to Plaintiffs' Opposition Memorandum (Rec. Doc. 75-2).

[14] *Id.*

conditions substantially worsened during the several hours following the initial mooring of the BELO. Or, if it was not apparent, the BELO's captain should have so inquired.

The Court similarly is not persuaded by Plaintiffs' reliance upon deposition testimony by Paul Morton of St. James regarding prior instances when vessels in the buoy system had experienced parting lines during high water conditions. While this testimony supports the notion that, under certain adverse conditions, extra measures must be taken to maintain a ship's mooring, it alone does not warrant a finding that St. James should have affirmatively intervened in Captain Zhong's command of his ship. In fact, Mr. Morton testified that it had *not* been St. James that had required the "hold in tugs. [15] To the contrary, it was the requirement of "[e]ither the captain, the pilot, the agent, whoever orders the tug."[16]

The Court reaches the same conclusion relative to the electronic mail exchanged, between 9:34 p.m. and 12:28 a.m., by the nearby fleet tug boats who had gathered, and were waiting, to commence unloading the BELO's cargo.[17] These messages reveal that at least some of the tug operators and St. James personnel did not think it safe, during that time frame and under those conditions, to put rigs and barges on the BELO.[18] In other words, they did not think it safe to commence cargo operations. That being said, however, the messages do not indicate that these mariners believed that the BELO's captain was so incapable of making appropriate determinations

---

[15] *See* Transcript of Deposition Testimony of Paul Morton, Exhibit E to Plaintiffs' Opposition Memorandum (Rec. Doc. 75-6) at pp. 140-45.

[16] *Id.*

[17] *See* Exhibit D to Plaintiffs' Opposition Memorandum (Rec. Doc. 75-5).

[18] *Id.*

regarding the ship's moorings and stability that his authority over, and familiarity with, the BELO should have been disregarded.[19]

Finally, the Court agrees that it would have been beneficial for the crews of these vessels and/or other St. James personnel to have suggested, or possibly even insisted, that a river pilot be summoned on an expedited basis, and/or that additional "hold in" tugs be utilized prior to the time that the mooring line killing Mr. Ledet parted.[20] The Court does not find, however, based on the limited evidence presented, that St. James was legally obligated, as a matter of law, to take such measures. As previously stated, when Captain Zhong believed it necessary to order a pilot and tug assistance, he did so by means of the ship's agent. Further, there is no evidence that St. James or Crescent personnel were aware that Captain Zhong desired, but could not get, more assistance for the BELO. To the contrary, Captain Zhong testified that, although it was possible, he had no radio communication with the NED FERRY because, "[a]t the time, [he] didn't think it was necessary ... as they were pushing hard and it was working well."[21]

## CONCLUSION

For the reasons stated herein, the Court disagrees that Defendant St. James Stevedoring LLC owed the legal duties that Plaintiffs, White Chestnut Shipping S.A. and Fleet Management Limited, seek to impose. Accordingly, **IT IS ORDERED** that summary judgment is

---

[19] To the extent that additional deposition testimony or other discovery might provide information favorable to Plaintiffs' position, *e.g.*, from other St. James and/or Crescent personnel or contractors, the Court has not been presented with any supplemental evidence to consider.

[20] As previously stated, the nearby fleet tugs did provide mooring assistance to the BELO. Although not requested by the BELO, Plaintiffs contend that this should have occurred earlier.

[21] *See* Zhong Depo. at pp. 74-75 and 124-25.

**GRANTED** in favor of Defendant St. James Stevedoring LLC. **IT IS FURTHER ORDERED** that the claims asserted by Plaintiffs are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 12th day of March 2010.

_____
KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE

Clerk to Copy:
Magistrate Judge Knowles